In matter of the application of The Rensselaer and Saratoga Railroad Company, Respondent, v. Emerson E. Davis and others, Appellants.

| 43 | 137 |
|----|-----|
| 110 | 126 |
| 43 | 137 |
| 160 | 247 |
| 43 | 137 |
| 170 | 1178 |
| 170 | 4181 |
| 43 | 137 |
| 173 | 1229 |

Upon the application of a railroad company to appropriate lands by the exercise of the right of eminent domain, delegated to it under the general railroad acts, it is for the court to decide as to the necessity and extent of such appropriation, and the determination of the board of directors of such company is not conclusive upon that question.

The acquisition of lands for speculation or sale, or to prevent interference by competing lines or methods of transportation, or in aid of collateral enterprises, remotely connected with the running or operating of the road, although they may increase its revenue and business, are not such purposes as authorize the condemnation of private property therefor. (Andrews, J.)

Accordingly, where a railroad company, having one of the termini of its road upon a navigable water-way extending into the territory of a foreign power, in its application for the acquisition of certain lands situate on the shore of such water-way near the said terminus, alleges, as a prominent reason for their condemnation, that a charter had been granted by such foreign government for the construction of a ship canal connecting the said water-way with other navigable waters, which, when completed, would greatly increase the business of the railroad, and that the lands were needed for the construction of slips and docks for the accommodation of vessels bringing freight to or taking it from the said road and of tenements for the employes of the railroad, and to meet the requirements of the anticipated increased business; and it appeared from the proofs that the company already had, at such terminus, a convenient and accessible water front and docks, which were used but in part, and were capable of extension on its own premises, and it did not appear that the work on the ship canal referred to had been commenced, or that the capital to construct it had been secured,—Held, that it was not sufficiently shown that the lands were required for the present or prospective business of the corporation within the meaning of the statute, and they could not be taken against the will of the owner.

The taking of private property for public uses is in derogation of private right, and in hostility to the ordinary control of the citizen over his estate, and statutes authorizing its condemnation are not to be extended by inference or implication.

An appeal lies to this court from an order of the General Term of the Supreme Court, affirming an order of the Special Term, in proceedings to acquire lands, involving the question of the right to condemn such lands under the statute.

(Argued November 29th, decided December 5th, 1870.)

Hand — Vol. IV.     18

APPEAL from an order of the General Term of the Supreme Court, in the third judicial department, affirming an order made at Special Term, appointing commissioners to ascertain and appraise compensation for certain marsh lands sought to be acquired under the railroad act, near Whitehall, on the shore of Lake Champlain.

The Rensselaer and Saratoga Railroad Company in August, 1870, presented their petition to the court to have the lands in question condemned, alleging that they required them for the purpose of operating their road and doing business thereon in order to receive and ship coal, iron, lumber and other articles and kinds of freight, and for necessary buildings, depots, freight houses, switches, tenements, slips and conveniences for a certain anticipated increase of business stated in the petition.

The principal affidavit in support of the application set forth that the board of directors of the railroad company, at a meeting thereof, had determined that the lands in question were required by the " company for the prompt, economical and proper performance of its present and prospective transportation business, and the carrying out of the purposes of its incorporation in securing to the general public a prompt, easy and cheap means of doing the business which shall be done."

That in making such determination the directors were influenced and controlled by the following facts and considerations :

" That a charter has been granted by competent authority in the province of Canada for the construction of a ship canal connecting the waters of the river St. Lawrence with the waters of Lake Champlain, so that vessels carrying 800 tons may freely pass from Chicago and the other ports upon the western lakes, to the port of Whitehall without breaking bulk or transhipment ; and that flour, grain and western freights, passing by that route to New York, will save five days in time and at least two dollars per ton in expense, in the opinion of the affiants, on the transportation of the same ; that efficient

steps are being taken to put such canal under contract and to complete the same within a period of two years.

" That in the opinion of the affiants, if said ship canal is completed as proposed (and deponents believe it will be completed), there will be needed at the port of Whitehall a depot for large amounts of grain and flour for distribution to Boston and New England generally, and that large space and opportunity for transhipment of the same from boats to cars by means of elevators and other appliances will be required at Whitehall for that purpose as well as for chutes and other arrangements for discharging large quantities of coal from cars to the boats on Lake Champlain for transportation north.

" That the Whitehall and Plattsburgh railroad is now in process of construction with the prospect of an early completion, and that when completed much space will be required to form its connections and to transact the buisness with the Rennsclaer and Saratoga railroad.

" That large amounts of iron ore are being sent every year into Pennsylvania and other iron districts south and west, and the demand for the same is constantly increasing, and that it is represented to and believed by deponents that the Messrs. Witherbees of Port Henry are sending this year 100,000 tons of ore to Pennsylvania which would load 11,000 cars, that the same is now sent by way of New York and Philadelphia at a cost of from five to seven dollars per ton, and that large amounts of coal are now brought by way of Rondout and the Hudson river for the business of the country north and east of Whitehall. That arrangements have been made for connecting the Saratoga and Schenectady railroad with the Albany and Susquehanna railroad, and the same is in process of construction and will soon be completed; that when that connection is perfected, it is agreed and arranged that the Rensselaer and Saratoga railroad shall bring coal to Whitehall and Lake Champlain for distribution to Canada, Northern New York and Northern New England, at a materially reduced rate from present prices, and will in return carry iron ore on the route to Pennsylvania and Elmira,

where large furnaces are now being built, at largely reduced rates.

"That arrangements are being made between the said Rensselaer and Saratoga railroad and the Hudson River railroad by which lumber is to be carried from Whitehall to New York, at all seasons of the year, at prices which will be in active competition with the rates of water transportation; and that in the opinion of the deponents a large amount of lumber will be carried by said roads as soon as the necessary facilities and conveniences can be established for that purpose.

"That there has been cleared by canal for the south at Whitehall in the last two years 325,800 tons of iron ore and 577,973 tons of lumber on the average, as the affiants are informed and believe, and that the same will, in the opinion of the affiants, indefinitely increase as the facilities and conveniences for carrying the same are increased and the mines and lumber trade developed.

"That in the opinion of the deponents, to do the business above indicated will require that there should be several slips and docks on which rails shall be laid connecting the said Rensselaer and Saratoga railroad with Lake Champlain at or in the vicinity of Whitehall, and that the premises described in the petition herein being a low marsh mostly covered with water and of a soft nature and adapted to dredging and the construction of slips, are well adapted to the purpose of constructing the slips and docks required for the purposes of the incorporation of said company, and the same are the only premises which could be adapted and used for such purposes at or in the vicinity of Whitehall in the opinion of the deponents."

It appeared from affidavits submitted on the part of the owners, among other things, that the railroad company already had on the shore of Lake Champlain, eleven acres of land with a water front of 1,000 feet, well adapted to the construction of slips and docks; that they only occupy about 100 feet of such water front, and the rest is unused and is capable of accommodating business increased " several fold."

*James Gibson*, for the appellants.

*Joseph Potter*, for the respondents, that the order is not appealable, cited In matter of Howard Street (12 How., 97); *N. Y. C. R. R. Co.* v. *Marvin* (11 N. Y., 276); General Railroad Act of 1850, §§ 14, 18.   That the determination of the legislature, or its delegates, as to the necessity for public use of private property is final and conclusive, 2 Kent, 340; 9 N. Y., 100; 18 Wend., 9; 20 Johns., 735; 3 Paige, 40; 5 id., 137, 160; 5 Seld., 100; 42 Barb., 119; *Hayward* v. *Mayor of N. Y.* (7 N. Y., 325); *Vt. & Can. R. R. Co.* v. *Verm. Cent.* (34 Vt. R., 2); 6 Jur. N. S., 1168; 25 Mis., 515, 540; 17 Ill., 123; 18 Ill., 326; 47 Maine, 345; 11 Jur. N. S., 406; *Jerome* v. *Ross* (7 John. Chy., 315); John & Cherry Sts., 19 Wend., 667; *People* v. *Smith* (21 N. Y., 595).   But if the exercise of this power by the legislature, or its delegates, is not conclusive in the premises, the same having been reviewed and affirmed by the Special Term, whose decision has been affirmed at General Term, this court will not reverse it.   (11 N. Y., 276; 12 How., 97; 1 Kern., 276; 3 How., 418; 3 Comst., 502; 3 Kern., 587; 2 Keyes, 55, 651; 37 N. Y., 487; 30 N. Y., 134; 31 N. Y., 115.)

ANDREWS, J.   It is insisted by the counsel for the respondent, that the determination of the board of directors, that the land in question was required for the purpose of the corporation, was conclusive upon the court below as to the necessity and extent of the appropriation, and that this court could not review it.   And it was claimed by the counsel for the appellants upon the argument, that the Special Term proceeded in making the order appointing commissioners upon this construction of the statute.

If the position of the respondent in this respect is sound, it is decisive of this appeal, and this question will be first considered.

The right to take private property for public use, is an incident of political sovereignty, and is to be exercised by

the legislative power of the State. The constitution of our State has recognized this right, and provided for its exercise upon compensation being made for the property taken.

It is founded upon the principle, that the interests of individuals are subordinate to the public interests, and that the former must yield, when the public welfare requires it. In theory, when the lands of an individual are taken by right of eminent domain, the State simply resumes the possession of that to which it has the ultimate title, and of which it has surrendered the present possession subject to the condition, that such resumption may be made.

From the nature of the case, it rests with the legislature, with whom the power to exercise the right rests, to determine for what public uses private property may be taken, and when the necessity exists, which calls for its appropriation.

It is, however, well settled, that the State may exercise the right to take private property for public use through agents constituted for that purpose, whether individuals or corporations, and that it is a legitimate exercise of the right, though the title to the property taken is vested in a private corporation, provided the purposes for which the corporation is to take are in any sense public, and concern the public welfare. (2 Kent's Com., 340 ; *People* v. *Herrick*, 20 N. Y., 595 ; *In re* Townsend, 39 N. Y., 171.)

The legislature may, therefore, authorize a railroad corporation, to take private property for the purposes of its incorporation under a delegation of the power of eminent domain, upon the construction now firmly settled, that such corporations exercise a public duty, and perform a useful public service. (*Beekman* v. *Sar. & Sche. R. R. Co.*, 3 Paige, 45 ; *Buffalo & New York R. R. Co.* v. *Brainard*, 9 N. Y., 100.)

The general railroad act, as originally enacted (Laws of 1850, chap. 140), provides for the taking by compulsion, by the corporations thereby authorized to be created, of real estate required for the purposes of their corporation.

It is to be done by application to the court upon petition, specifying, among other things, that it is the intention of the

corporation applying to construct and finish the railroad specified in its articles of association; that the line of the proposed road has been surveyed and located, and a certificate of the location filed as prescribed by the act; and that the land described in the petition is required for the purpose of constructing the road.  (§ 14.)

By the fifteenth section of the act, on the presentation of the petition, with proof of its service, and of service of notice of the time and place of the application, the parties, whose estates or interests are to be affected by the proceedings, may show cause against granting the prayer of the petition, and may disprove any of the facts alleged therein; and the court is thereupon to hear the proofs and allegations of the parties; and if no sufficient cause is shown against granting the prayer of the petition, it shall make an order for the appointment of commissioners to ascertain and appraise the compensation to be made to the persons interested in the real estate proposed to be taken.

It was the primary, if not the sole purpose, of these provisions, to provide for the taking of such land, as should be required for the original construction of the road.

The legislature in 1869 (Laws of 1869, chap. 260) extended the powers granted by the original act, and amended the same by providing that, if at any time after the construction of any railroad by any company then existing or thereafter to be created, such company "shall require for the purposes of its incorporation, or for the purpose of running or operating any railroad owned or leased by such company, any real estate in addition to what it has already acquired, or shall require any further right to lands, or the use of lands for switches, turnouts, or for any other purpose necessary to the operation of such railroad," such company may acquire such additional real estate by voluntary agreement and purchase; and if unable to do so, "such company may proceed to acquire or perfect title to such real estate,  *  *  *  and to ascertain and appraise the damages" in the manner and by the proceedings prescribed in the act.

It is, we think, the clear construction of the statute, that the court is to determine upon the application by a railroad company, to acquire additional lands, for the purposes of the incorporation, the question as to the necessity and extent of the appropriation.

The plenary power of the legislature over the subject would have authorized it to designate the particular premises which the respondent might take for its purposes. The general purpose being public, the legislature could have defined the extent of the appropriation, necessary to the public use. But this the legislature has not attempted to do, nor has it delegated to the railroad company, the power to determine the necessity for the appropriation of private property for corporate purposes. It has constituted the court a tribunal to hear and determine on the premises.

· The parties, whose property is sought to be acquired, " may disprove any of the facts stated in the petition," and the court is " to hear the proofs and allegations of the parties," and then to determine.

These provisions would be unnecessary and unmeaning, if the power to pass upon the necessity of the appropriation of the lands by the corporations, did not reside in the court. The matter is one of judicial cognizance, and the court in respect to it, exercises a judicial and not a ministerial function. It would be a most dangerous power to confide to railroad corporations. They hold their franchises for a public use within the meaning of the Constitution, authorizing private property to be taken for public use; but they are organized and administered primarily for private gain, and it never could have been intended, that the right of a citizen to his property should be subject to the absolute will of such corporations.

We conclude, therefore, that the court at Special Term had jurisdiction to consider and determine, whether the lands of the defendants were within the statute, necessary for the corporate purposes of the respondents.

The next question we shall consider relates to the sufficiency of the facts appearing before the court, to justify the order for the appointment of commissioners.

It is quite apparent from the proofs, that the present business of the respondents does not require for its accommodation, the lands sought to be taken by this proceeding.

It is the prospective and not the present necessities of the company, upon which the application is founded. It is true, that as the country becomes more populous, and facilities for intercommunication between different sections are extended, an increase in the business of existing railroad corporations is to be expected; but when private property is demanded by a corporation under the power of eminent domain, based upon an alleged prospective increase of its business, which will require increased accommodations, it should be established beyond reasonable doubt, that such increase will occur.

Opinions upon this subject, based upon conjecture and the execution of collateral enterprises not yet undertaken, should have but little weight.

The affidavits in this case of the directors, in support of the petition, set out as a prominent reason for the acquisition of the defendants' land, that a charter had been granted by a foreign government for the construction of a ship canal, which, when completed, will greatly increase the business of the respondent; but it does not appear that the work has been commenced, or that the capital to carry it on has been secured.

The respondent, when the petition was presented, owned, as appears by the proofs, a convenient and accessible water front and docks on the lake, which were used but in part, and which are capable of extension upon its own premises.

We are not satisfied, from the proof in the case, that the lands of the defendant are required by the respondent for the present or prospective business of the corporation.

The authority given to the railroad company by the act of 1869 is to acquire lands by condemnation, for the purposes of its incorporation, and for certain specified purposes, and for

any purpose other than those particularly specified "necessary to the operation of their road."

It is difficult, as a matter of law, to define by general statement what purposes are corporate purposes, or what are the necessary purposes for which lands may, under this act, be taken; and probably the subject is incapable of exact limitation.

It may, however, be safely asserted that the acquisition of lands for the purpose of speculation or sale, or to prevent interference by competing lines, or methods of transportation, or in aid of collateral enterprises remotely connected with the running or *operating* of the road, although they may increase its revenue and business, are not such purposes as authorize the condemnation of private property.

And when the corporation claims to acquire lands under a delegation of the power of eminent domain, it must show express authority of law to justify the claim.

The taking of private property for public uses, is in derogation of private rights. It is in hostility to the ordinary control of the citizen over his estate, and statutes authorizing condemnation are not to be extended by inference or implication.

In this case, among the purposes stated by the respondent for which the land of the defendant is required, are the construction of tenements, and of slips and docks upon the lake.

The construction of dwellings for employes or officers, and the construction of slips for the accommodation of vessels bringing freight to, or taking it from the railroad company, are not, we think, upon the proofs before us, necessary corporate purposes, within the statute.

The authority of the respondent to acquire by voluntary purchase, lands for these purposes, is within the powers granted by the act.

In conclusion upon this branch, we say that it is not for the court to deny or abridge the power of eminent domain. It is a prerogative power, necessary to the government and the welfare of its citizens. At the same time, it should not

be allowed to be exerted by, or in behalf of, individuals or corporations, except under the express sanction and clear authority of law.

We think that an appeal lies in this case to this court from the order of the General Term, affirming the order of the court below.

The decision of the Special Term was a final adjudication of the question of the right of the respondent to a condemnation of the lands under the statute.

The subsequent proceedings relate only to the assessment of damages and the review by the court of the action of the commissioners.

The order appointing the commissioners is a special proceeding, from which an appeal to the General Term lies under chapter 270 of the Laws of 1854, and is a final order affecting a substantial right, made in a special proceeding, within subdivision 3 of section 11 of the Code. (*People* v. *Boardman*, 4 Keyes, 59; *In re Townsend*, 39 N. Y., 171.)

The order appealed from is reversed and application denied with costs, without prejudice to a new application.

All the judges concurring except PECKHAM, J., who took no part in the decision.

Order reversed.