Rapallo, J.
These cases present questions of difficulty and importance, involving, as they do, a conflict between the powers of public officers or bodies, to whom the right of eminent domain has been delegated by the legislature, and the rights of individuals, over whose property these powers are exercised. There is a strong equity in the claim made by the appellants, and which has beeti. pressed upon us with much force and ability, that the election to take their property when once exercised in such manner as to bind the owners, should be equally binding upon those who are empowered and elect to take it; and that the owners should not be exposed to repeated applications for this purpose, which might result, not only in keeping them in perpetual suspense as to their ownership, but might enable the other party to abuse the power intrusted to it, by repeatedly making and withdrawing applications until it should obtain an appraisal satisfactory to itself, and thus deprive the owners of that just compensation for their property which is guaranteed to them by the Constitution of the State. On the other hand, it must be considered whether the apprehension of such an abuse of power is sufficient ground, in the case of a public improve *149 ment, carried on by public officers, to absolutely preclude them from discontinuing their proceedings on discovering that the expense involved, and which is to be defrayed by the public or by assessments upon other property owners, will exceed the benefit to be derived from the improvement. In the present case, we may lay out of view those in which the right of eminent domain is delegated to corporations representing private as well as public interests, and who are to defray the expense out of private capital, and in part, at least, for private benefit. For, although certain sections of the general railroad law are incorporated in the act under which the present proceedings are instituted, yet these sections are adopted with reference merely to the form of procedure; and their adoption for that purpose does not affect the considerations which result from the public character of the present improvement, or the purely public nature of the duties confided by law to the officers whose acts are now in question.
The decisions of the English courts sustain the positions contended for by the property owners in the present case, and have maintained the doctrine as well in public street improvements in a city as in cases of railway and market corporations, that where, by act of parliament, commissioners for improving a street, or the managers of a railway company, are authorized to purchase private property for the purposes of the act, or to acquire title to it by appraisement, after giving notice to the owner requiring him to treat or submit to an appraisement, the mere giving of the notice is an election to purchase the land described in the notice; and that this election, being binding upon the owner of the land, is also binding upon the street commissioners or railway company. In 1831, in the case of The King v. The Commissioners for Improving Market Street, Manchester (4 B. & Adol., 335, note), the commissioners had been authorized by the act to purchase certain lands for the purposes of the improvement; and the act provided, in the usual form, that they might give the owners notice that the lands described in the notice were wanted for the purposes of the act, and that if the owners *150 refused, for a certain time, to treat, or if the price should not be agreed upon, the commissioners might issue a warrant to the sheriff to summon a jury to appraise the land, etc. The commissioners gave notice to one Hewall that his property was wanted for widening the street; and after negotiation and failure to agree upon the price, refused to proceed further. The owner applied for a mandamus to compel the commissioners to issue their warrant for the summoning of the jury, alleging that he was materially injured by the delay. The commissioners answered that their funds were limited, that the sum demanded was large, and that the improvement to be effected by taking the premises in question would not, in their judgment, warrant such an expense. The court, notwithstanding, issued the mandamus. In 1832, in the case of The King v. The Hungerford Market Company (4 B. & Adol., 327), under a similar statute, a like decision was rendered, the Manchester case being cited -as an authority, and the court holding that the notice bound the company to take the property. In Stone v. The Commercial Railway Co. (4 Mylne & Craig, 122), in 1839, it was held, by Lord Cottehham, that where a railway company had, pursuant to an act of parliament, given notice to the owner of certain property requiring him to treat for the sale of it, the company was bound to issue a precept for the appraisal of, and to take, the whole quantity of land described in the notice, though but part only was actually wanted. That the giving of the notice established the relation of vendor and vendee between the company and the owner. In Tawney v. Lynn & Ely Railway Co. (16 L. Jour. [N. S.], Equity, 282) the same doctrine was held; and in 1848, in the case of Walker v. The Eastern Counties Railway Co. (6 Hare, 594), under a similar act, when the company had given notice to the complainant that it required to purchase a certain quantity of his land, and was willing to treat, etc., specific performance was decreed, compelling the company to complete the proceedings for the appraisal.
These cases fully established the proposition contended for *151 by the appellants, that when a corporation or public body is empowered by law to require the owner of land to sell or surrender it at an appraised value, the election to take it becomes binding upon the party seeking to acquire title as soon as it has taken such steps as compel the other party to sell or submit to have it taken at an appraised value, and if the doctrine of those cases prevailed in this State, it would' be a necessary consequence that the appointment of commissioners of appraisal—which would, under the present act,, establish the right of the park commissioners, as against the owners, to acquire title to the specific lands in question — would not only preclude them from withdrawing the proceedings, but would require the courts to compel them either by mandamus or decree for specific performance to complete the proceedings. The appointment of commissioners, in the present case, would stand in place of the notice, which, under English statutes, is binding upon the land owner.
But for a long period, extending beyond that covered by the English decisions, a different doctrine has been held in this State, at least in respect to public improvements. It is useless to attempt to reconcile our adjudications with the doctrine of the English courts. They proceed upon different principles, and do not recognize any contract obligation between the owner and public officers or municipalities as resulting from the election of the latter, under authority of law, to take specific lands for public purposes. It must be conceded that they, in fact, afford less protection to the land owner, and a larger discretion to those to whom the right of eminent domain is delegated, than do the English decisions.
Under the act of 1813 (2 Rev. Laws of 1813,408, §§ 177 and 178) the corporation of the city of New York was empowered to order streets opened or enlarged, etc. When lands were required for the purpose, the corporation was authorized to apply to the Supreme Court for the appointment of commissioners of estimate and assessment, and on such application, the court was empowered to appoint three *152 commissioners to appraise the damages to be paid or allowed for the land required, and to assess the expense on the property benefited. On the coming in of the report of these commissioners, the court was required, after hearing any matter which might be alleged against the same, either to confirm the report or refer it back to the same commissioners for revisal, or to new commissioners ; and to do the same on the coming in of the second report, and to continue the process until a report should be made which the court should confirm, and when confirmed the report was declared final and conclusive as well upon the city as upon the property owners, and on such final confirmation the corporation was declared seized in fee of the land, and authorized to take possession of the same in trust, etc.
Under that act, it is apparent that either'-the order of the corporation for the making of the improvement, or the appointment of the commissioners, was a final determination, binding upon the land owner, as to the right of the city to take the land within the lines of the street or public place ordered to be opened or enlarged, etc., and that no means were provided by the act by which the land owner could question the right of the corporation to take and acquire title to that property. It is true that, upon the coming in of the report of the commissioners, the court was to hear any matter which might be alleged against it; but no power was given to the court to reject the report and refuse to confirm it on the objection of the owners of property taken, that the improvement was not needed, and that their land, if within the lines, was unnecessarily taken. (Matter of Albany Street, 11 Wend., 151.) On the contrary, although ample provision was made for repeated revisions of the report, the law positively required that it be ultimately confirmed.
It is clear that, before confirmation of the report, the owners of the property embraced in the opening, widening, etc., of the street or public place, were as finally concluded by the action of the corporation, as to its right to acquire title to their property as were the owners who received notice *153 under the English acts, or those against whom commissioners of appraisal are appointed under the acts now in question. The cases are therefore analogous, and the decisions under the act of 1813, determining at what stage of the proceedings the corporation may be permitted to discontinue, govern the present case.
It is urged, on the part of the appellants, that those decisions are not applicable, for the reason that, under the act of 1813, the appointment of commissioners did not change the title to the land, and that such title did not vest in the city until the final confirmation of the report; whereas, it is contended, that under this act the change of title takes place either on the mere vote of the park commissioners entered upon their minutes, pursuant to the first section of the act of 1872 (chap. 45), or upon the appointment of commissioners of appraisal pursuant to section 15 of the general railroad law, as incorporated in the act of 1872.
We are clearly of opinion that the mere vote of the park commissioners does not divest the title of the land owner, and is not of itself a condemnation of the land, but only a necessary preliminary to such condemnation. Before the land can be condemned the park commissioners must treat with the owners for its purchase, and the process for acquiring title in case of failure to agree is prescribed. They may locate and lay out approaches, taking for the purpose parts of existing streets. The general clause, that all streets, tracts, pieces or parcels of land so acquired, selected or located by the commissioners shall be deemed to have been taken by the city for a public park, and shall be deemed to be such, is distributive, and its proper construction is that private property, when acquired by purchase or proceedings under the act, and existing streets when selected, etc., shall be deemed to have been taken for the purposes of the park, etc.
The appointment of commissioners has no greater effect under this act than under the railroad act. Section 15 of the railroad act authorizes the appointment of commissioners of appraisal after a hearing of the parties interested, and this *154 appointment has been held by us to be a final adjudication on the right of the petitioners to a condemnation of the land. (Rens. & Sar. R. R. v. Davis, 43 N. Y., 137.) But we have not held that it changed the title, or was of itself a condemnation. On the contrary, the seventeenth and eighteenth sections of the railroad act, which are also incorporated into the act of 1872, require not only that the report be confirmed and an order reciting the proceeding made and recorded, but that the compensation be paid or deposited, before possession can be taken; and as to lands for depot purposes, which may be taken in fee, this payment must precede the change of title.
The case is, therefore, analogous to that of a street improvement, under the act of 1813. The only difference being, that in the one case the act declares that the title is acquired on final confirmation of the report, and in the other, to this must be added payment or deposit of the compensation.
A long series of decisions has established that in these street cases the corporation may be permitted to discontinue .proceedings at any time before rights resulting therefrom have become vested in the property owners. They further hold-—differing in. this respect from the English cases — that no such rights are vested until the report of the commissioners is finally confirmed, and there is a final award in the nature of a judgment in favor of the property owners for their compensation.
The first case I find upon the subject is that of The Corporation of New York v. Dover Street (18 Johns., 505). Commissioners had been appointed and their report set aside and new commissioners appointed, who refused to act; and application was made by the corporation, which was opposed by owners of lots to be taken, who claimed a vested right to compensation, on the ground that the corporation having ordered the improvement, they were bound to carry it out; that having ordered the property of individuals to be taken, they could not deprive them of compensation. The court treated the case as if no commissioners had been *155 appointed, and said that before commissioners were appointed or report made, no rights were vested which required the corporation to go on, or the courts to refuse leave to discontinue. In The Matter of Beekman, Street (20 Johns., 269), which is the only case in which leave was refused, the report had not been confirmed, but leave to discontinue was refused upon the ground that the proposed improvement had been long pending, and the city had pledged its faith to it and induced parties to build accordingly. The opposition came from parties interested in having the improvement carried out, and not from those whose property was taken. Their rights were not in question. In the matter of the same improvement in the same year (Corporation of New York v. Mapes, 6 Johns. Ch., 49), an application was made by the corporation for an injunction to restrain owners of property to be taken from improving their land, which was denied by Chancellor Kent on the ground that no rights had become vested to prevent the corporation from abandoning its plan, or the owners from improving their property; and he intimated the opinion that before confirmation of the report the corporation might discontinue. In The People v. The Village of Brooklyn (1 Wend., 319), under a similar act, the commissioners had made their report in the matter of opening a street, assessing the damages to be paid to some of the relators, for land taken, and a mandamus was applied for to compel the filing and confirmation of the report, which was denied, it being held that no rights had vested, and if they had, the remedy of the relators was by action for the recovery of their awards. In The Matter of Canal Street (11 Wend., 154), it was expressly held that proceedings for opening, etc., streets in the city of Hew York, under the act of 1813, might be discontinued by order, after the report of the commissioners of estimate and assessment had been made, and before confirmation; Savage, Ch. J., assigning as the ground of decision that no rights were vested until after confirmation of the report; that the corporation could not know whether the damages to be levied would not exceed the benefit to be *156 derived from the improvement, until after the commissioners had reported; and that when it appeared that by carrying out the improvement ruinous assessments would be imposed upon property not taken, in excess of the benefit to the public, it was improper to proceed. Again, in The Matter of Anthony Street (20 Wend., 620), it was held that until final confirmation of the report of the commissioners, there was no vested right to the damages assessed, and that the corporation might discontinue by leave of the court. And in Martin v. The Mayor of Brooklyn (1 Hill, 545), where the report had been made but not filed, it was again repeated that a land owner, after assessment of his damages, has no vested rights until the confirmation of the report.
As to the city of Hew York, the doctrine of these decisions has been incorporated in the statute, and application to the court for leave to discontinue dispensed with. The act of 1839 (chap. 207, § 7) declares that the mayor, etc., shall be authorized, at any time previous to the confirmation of the report by the court, to discontinue all further proceedings relative to the improvement, without the necessity of an application to the court for leave to do so. And, according to the charter of 1873 (chap. 355, § 107) the board of street opening and improvement may, at any time before'confirmation of the report, discontinue proceedings, with power to cause new proceedings to be taken for the appointment of new commissioners.
The decisions to which reference has been made, are wholly independent of these enactments, and seem to reserve to the courts some discretion in the matter of allowing a discontinuance of the proceedings. How far their discretion might be exercised, either in the way of refusing leave to discontinue in cases where the right is not given by statute, or in refusing to entertain new proceedings, manifestly in fraud of the constitutional right of the citizen to a just compensation for his property, when sought to be taken for public use, it is not necessary now to consider. The point involved in the case now before us is, whether, when the application for le: ve *157 to discontinue was made, any rights had become vested in the property owners which required the court to refuse the leave asked. We think that the cases cited establish that no such rights had become vested, and that those cases, after having so long been acted upon, should not be disturbed; that they are decisive as to the power of the court below to permit the discontinuance; and, that even if the exercise of this power were discretionary, we should not interfere with the exercise of that discretion. By making the application, for leave, the park commissioners conceded to the court the power to determine the terms upon which it should be granted; and the cases cited seem to recognize the necessity of such leave. The terms imposed are eminently just, and we have concluded to affirm the orders appealed from, on both sides, without costs to either party in this court.
All .concur.
Appeals dismissed.