The Suburban Rapid Transit Company, Appellant, *v.* The Mayor, Aldermen and Commonalty of the City of New York et al., Respondents.

Although it may be within the power of the legislature to deprive a corporation of a franchise granted to it by its charter, if some public necessity demands it, the power will not be deemed to have been exerted, in the absence of some unequivocal expression of legislative intent.

That construction of a statute should be avoided which will injuriously affect existing rights, and one given which will harmonize its objects with the preservation and enjoyment of all such rights.

A railroad corporation duly organized under and in pursuance of the "Rapid Transit Act," (Chap. 606, Laws of 1875), acquires by the act of incorporation, and upon obtaining the necessary consents of the public authorities and the property owners, an indefeasible right to construct its road upon the route or routes designated in its articles of incorporation; the lands necessary for the purpose are by the sovereign power appropriated to that exclusive use, and a lien is impressed upon them in favor of the corporation, which ripens into title through purchase or condemnation proceedings; the subsequent condemnation of the lands in the course of the railroad construction is merely incidental, in order to compensate property holders.

The distinction between such a corporation and one organized under the General Railroad Act pointed out.

Prior to the passage of the act of 1884 (Chap. 522, Laws of 1884), providing for the laying out of new parks in the city of New York, plaintiff had been organized under the "Rapid Transit Act;" one of its routes, as located by the articles of association and to which the necessary consents of the public authorities and property holders had been obtained, ran through private grounds. These were included in one of the parks designated in said act; subsequent to its passage, plaintiff, by condemnation proceedings, acquired the right to the strip of land over which the

1891.]     S. R. T. Co. v. Mayor, etc., of New York.     511.

route was located. The commissioners of estimate, appointed under the act of 1884, made an award to plaintiff, as the value of the strip, which it refused to receive. The city authorities, claiming to have acquired the fee, took possession of the strip and prevented plaintiff from proceeding with its work of construction thereon. In an action to determine the rights of the parties, *held*, that plaintiff, by and upon its organization, became possessed of the absolute and exclusive franchise to construct, operate and maintain its road over the strip in question, which operated to vest in it a legal right to have said strip; that said franchise was not impaired by the fact that the work of actual construction had not been commenced or the land condemned before the passage of the act of 1884, and plaintiff was not divested thereof by the proceedings under said act; that it was inoperative to take away or to authorize a deprivation or curtailment of such right; that it was not necessarily to be inferred from the language of the act that it was the legislative intent to destroy the prior public use included in plaintiff's franchise, but rather that the two uses should stand together; and that the appropriation for a public park was intended to be subject to the exercise by the plaintiff of its franchise.

(Argued June 18, 1891; decided October 20, 1891.)

Appeal from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made April 17, 1891, which affirmed a judgment in favor of defendants entered upon an order of Special Term sustaining a demurrer to the complaint.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Burton N. Harrison* for appellant. The General Term disregarded the consents of public authorities and property holders, consenting to plaintiff's railways, and attributed no significance to the proceedings of the rapid transit commissioners, in 1880, locating plaintiff's routes. Its order is erroneous and should be reversed, with the judgment founded on it. (Laws of 1875, chap. 606 ; *R. H. & T. R. R. Co.* v. *N. Y., L. E. & W. R. R. Co.*, 110 N. Y. 128 ; *In re U. E. R. R. Co.*, 112 id. 74 ; *People* v. *O'Brien*, 11 id. 1 ; *S. W. Co.* v. *City of Syracuse*, 116 id. 182 ; *In re R. W. Comrs.*, 66 id. 418.) A company incorporated under the Rapid Transit Act has no power to abandon or change any portion of any route

prescribed for it, but must complete the railway upon every portion of each of those routes, or it forfeits all its rights and franchises there or elsewhere. (Laws of 1875, chap. 606, § 7; *In re N. Y. C. Co.* v. *Mayor, etc.,* 104 N. Y. 1.) Provisions of the Rapid Transit Act, which show that the plaintiff's routes having been lawfully located, and the requisite consents having been given by the public authorities and the owners of abutting property, plaintiff is now entitled to enter upon every part of the lands through which such routes were so located, for the purpose of constructing and operating the railway prescribed by the commissioners. (Laws of 1875, chap. 606, §§ 4, 26; Laws of 1891, chap. 4.) The property the plaintiff had and has in plaintiff's franchise to construct and operate its railway on the route in question, was in 1884, and now still is, property which, under the Constitution, could not be taken from plaintiff, except upon due compensation. (*City of Detroit* v. *D. & H. P. R. Co.,* 43 Mich. 140.) This being a case where the defendants are attempting, under color of chapter 522, Laws 1884, to take from plaintiff lands which had already been devoted to a public use before that act was passed, and to divest plaintiff of the franchise there to construct and operate a railway, defendants must show the intent of the legislature in clear and express terms, or by necessary implication in the act they rely on. (*In re B. & A. R. R. Co.,* 53 N. Y. 577; *In re City of Buffalo,* 68 id. 167; 99 N. Y. 23.) The legislature has, by the act of 1888 (Chap. 421 of the Laws of that year), amending the New Parks Act, shown what the legislative intent was as to this plaintiff's railroad right of way in chapter 522, Laws of 1884. (*Gue* v. *Tide Water Canal Co.,* 24 How. [U. S.] 157; 2 Morawetz on Corp. §§ 924, 1125; *People* v. *O'Brien,* 111 N. Y. 1, 60; Laws of 1888, chap. 421, § 2; *In re R. W. Comrs.,* 66 N. Y. 422; *N. Y. & O. M. R. R. Co.* v. *Horn,* 57 id. 473.) The mention made at the end of section 1 of chapter 522, Laws of 1884, of the report of the commissioners under chapter 253, Laws of 1883, incorporates that report in the act and allows reference to it to ascertain the legislative intent. (*Furman* v. *Mayor, etc.,* 5

Sandf. 16; *People* v. *Dana*, 22 Cal. 11; *Municipality* v. *Morgan*, 1 La. Ann. 111; *Blake* v. *Nat. Banks*, 23 Wall. [U. S.] 307, 321; *People ex rel.* v. *Schuyler*, 79 N. Y. 189.) The principles here appealed to in construing chapter 522, Laws of 1884, are all cardinal rules for the interpretation of statutes.   (80 N. Y. 339; 99 id. 49; 55 id. 50; 5 Den. 9; 2 Cow. 419; 1 Paige, 117; 32 Barb. 448; 68 N. Y. 591.)   The complaint demands appropriate relief.   (*R. H. & L. R. R. Co.* v. *N. Y., L. E. & W. R. R. Co.*, 110 N. Y. 134.)

*D. J. Dean* for respondents.  By the condemnation pro-ceedings under the New Parks Act (Chap. 522, Laws of 1884), the land in question was acquired by the city as part of St. Mary's park.   (Laws of 1875, chap. 606, § 17; Laws of 1883, chap. 253; *In re City of Buffalo*, 68 N. Y. 175.)   On June 14, 1884, by the passage of the New Parks Act (Chap. 522, Laws of 1884), the land in question in St. Mary's park was impounded for the public use of a new park, and the filing of the railroad's petition on August 30, 1884, could not operate to disturb the right of the public to the land for their new park.   (*In re Department of Public Parks*, 53 Hun, 287; *In re Munson*, 29 id. 325.)   The land in question having been taken for a public park, cannot be diverted to the purposes of a railroad.   (*In re B. & A. R. R. Co.*, 53 N. Y. 575; *Anderson* v. *R., etc. R. R. Co.*, 9 How. Pr. 553; *In re N. Y. & B. B. R. R. Co.*, 20 Hun, 302.)

Gray, J.   The allegations of the complaint in this action are not in dispute, with respect to their recital of facts, of statutes and of proceedings, and, by the demurrer interposed by the defendants, a question of law is presented, which is of considerable importance and is not free from difficulty.

The plaintiff was organized in 1880, as a railroad corpora-tion, under the provisions of chapter 606 of the Laws of 1875, usually referred to as the "Rapid Transit Act."   By the reso-lution of the rapid transit commissioners, as embodied in the articles of association, certain routes were determined upon.

and located, to which the necessary consents of the public authorities and of property owners were also obtained. Subsequently, by condemnation proceedings under the statute, the new company duly acquired the right to a strip through private lands, over which one of the routes had been located and concerning which the present controversy has arisen with the authorities of the city of New York. In June, 1884, chapter 522 of the Laws of that year was enacted by the legislature, by the provisions of which the laying out of certain new parks was authorized in the Twenty-third and Twenty-fourth wards of the city. One of these parks, therein designated as "St. Mary's Park," included within its limits the strip of land in question, which the railroad company claimed title to as a part of one of the located routes defined in its articles. The commissioners of estimate, for the appointment of whom this act made provision, in the course of proceedings by the city authorities to acquire the lands for the parks, reported upon a certain amount to be paid to the plaintiff as the value of the strip of land in question; which report was confirmed by the court, against the company's objection, made both to the taking of the land and because of the failure of the commissioners to make any estimate of the damage resulting from the deprivation to the company of its franchise. The plaintiff refused to take the amount of compensation adjudged to it; but the city authorities claimed, nevertheless, to have acquired the fee to the land, took possession thereof as a part of the authorized area of St. Mary's park and, by resolution of the Board of Commissioners of Public Parks and by acts of its officers, prevented the plaintiff from proceeding with any work of construction within that area. This action was then brought, on the equity side of the court, and the relief demanded is a judgment that, prior to the passage of the act creating the new parks, the plaintiff had the right to acquire for its railroad purposes the title to the strip of land through the tract designated as St. Mary's park; that by the proceedings of appraisal it had acquired that title and was not divested thereof by the order confirming the report of the commissioners under the New Parks Act, and

that the defendants should be enjoined from preventing the plaintiff from constructing its railways as required by its articles of association.

The court below, at Special and General Terms, has denied to the plaintiff the relief it has demanded, and the learning and ability of the judges, whose opinions are contained in the record before us, add to the responsibility of coming to a conclusion at variance with that reached by them after their consideration of the questions.    I am conscious, too, of the necessity of so expressing the reasons, which influence our conclusions, as to lend to the force of mere authority the substance of sound judicial exposition.

The question, which is presented to us, relates to the effect of the passage of the New Parks Act of 1884, upon any then existing franchises and rights of the plaintiff corporation.    If by its organization, under the Rapid Transit Act of 1875, it had become possessed of the franchise to construct, operate and maintain its railroad over the routes designated and located by the mayor's commissioners, which operated to vest in it a legal right to have the lands affected by the designation, then I think we must hold that the act of 1884 was inoperative to take away, or to authorize the deprivation, or curtailment of such a right.

The text of the opinions rendered in the Supreme Court is that the plaintiff, at the time of the passage of the New Parks Act in 1884, had acquired no actual ownership in the land in question and had not commenced the proceedings to acquire such ownership.    Therefore, it was considered that by the act of 1884 there was an exclusive devotion of the land to strictly park purposes, which was a use inconsistent with a railroad use, and that any inchoate right, previously acquired by the plaintiff, to proceed to the acquisition of the land for the construction of its railway was defeated.

The learned justices seem to have fallen into two errors. They have given to the language of the New Parks Act a construction, by which the particular tract of land, designated for St. Mary's park, is appropriated to such a purpose to the

exclusion of the plaintiff's railway, and they have failed to recognize the acquisition and possession by the plaintiff of an indestructible franchise, in the exercise of which the condemnation of the land was but an incidental feature and in furtherance of a scheme which the organization of the corporation had given vitality to and to which, in the view I take, the land had become subjected by the paramount exercise of sovereign power. The learned justice at Special Term admitted that, at the time of the passage of the New Parks Act of 1884, the lands through St. Mary's park "had been lawfully designated under a general act as part of the general route of the plaintiff's railroad ; " but because not "devoted to a railroad use actually in exercise," he thought that " there was no actual prior use to be considered by the legislature."

In the discussion of this case, our first consideration should be given to the legal status of a corporation which has been organized under the Rapid Transit Act of 1875. When, by the determination of commissioners, appointed by direction of the act by the public authorities for that purpose, the public necessity for a railway has been established, they are required to fix and determine the route or routes of that railway ; and they are given the exclusive power to locate them over the streets and lands in city or county. They must decide upon the plans for the construction of the railway or railways, with all the " accompaniments in tracks and buildings and other requisite appliances upon the route or routes, and in the locations determined by them." They must fix and determine the time within which such railway or railways, or portions of the same, shall be constructed and ready for operation ; the maximum rate of fare and the amount of capital stock, etc. They must then prepare articles of association for the company to be formed, "in which articles shall be set forth and embodied as component parts thereof the several conditions, requirements and particulars " determined by the commissioners, pursuant to the preceding sections of the law ; and which further shall provide for the release and forfeiture " to the supervisors of the county of all rights and franchises acquired

by such corporation, in case such railway shall not be completed within the time and upon the conditions therein provided." When the whole capital stock has been subscribed, in books opened upon public notice by the commissioners, and the prescribed percentage has been paid in, the subscribers meet for organization and elect directors, to whom the commissioners are to deliver a certificate of organization setting forth the articles of organization. Three of the directors are then to make an affidavit as to stock subscriptions and payments, and that it is intended in good faith to construct, maintain and operate the railway or railways in the articles of association mentioned. The certificates and articles are to be filed and "thereupon the persons who have so subscribed such articles of association and all persons who shall become stockholders shall be a corporation, etc." (Chap. 606, Laws of 1875, §§ 4 to 9.) All that the legislature has prescribed in these sections is essential to the legal incorporation of the new company and for the enjoyment and enforcement by it of corporate rights and privileges; and, on the other hand, when so legally organized, the company's rights are fixed and its sphere and plan of operation are limited and rigidly defined. All that remains for it to do is to proceed with the building and operation of its road, in the manner planned and upon the routes located by the commissioners and which are set forth in its articles of association. Differing from the ordinary railroad corporation organized under the General Railroad Act, which is privately formed, and which, as to the scope and conditions of its undertaking, has little fixed upon organization, except the termini of the road and the counties it will pass through, the company organized under the Rapid Transit Act of 1875 springs into existence fully equipped and endowed with rights and privileges, with its line of way already designated and its structures and appliances already planned; of which nothing is alterable by its members. The act of 1875 was a scheme devised for furnishing, within large cities and in counties, quick steam railway communications, and that the construction of any such railway should only be when and

where a public necessity existed, and as would best subserve the public advantage.   The determination as to the necessity and as to the number and location of the routes and as to details of the formal organization of the company, which should operate them, were matters entrusted to public agents, to be selected by the mayor of the city, or the county supervisors.   Thus, these were fundamental features, which were planned for the new corporation, and were fixed and beyond the control or power to change of its future members.

With the ordinary railroad company, formed under the General Railroad Act, the enterprise, as to construction and operation, is inchoate, after it is erected into a corporation; whereas the corporation, which is erected under the Rapid Transit Act, commences its existence and operations with everything planned and, except in details, perfected.   Its line of road is located and the streets, places, or lands, over which it is defined by the commissioners, are impressed with a public use and are dedicated to the purposes and uses of the corporation to be organized.

In the case of the *New York Cable Co.* v. *Mayor, etc., of New York* (104 N. Y. at p. 31), it was said of the Rapid Transit Act that its distinguishing feature was that "the company to be organized is not left at liberty, as are railroad companies formed under the General Railroad Act, and as were those which formerly were created by special acts, to decide for themselves upon the plan of construction; but that subject was placed under the exclusive control of the commissioners, in addition to the exclusive power to locate the route or routes."   The route, or routes, located are unalterable by the company and I think the property, over which the line of the route runs, must be affected as fully for the purpose, as it would be in a case where, under the General Railroad Act, a corporation has made and filed a map and survey of the line of route it intends to adopt for the construction of its road and has given the required notice to all persons affected thereby. In such a case, we have held that the corporation "has acquired the right to construct and operate a railroad upon such line,"

and that " by its proceedings it has impressed upon the lands a lien in favor of its right to construct, which ripens into title through purchase, or condemnation proceedings." (*Rochester H. & L. R. R. Co.* v. *N. Y., Lake Erie & W. R. R. Co.,* 110 N. Y. 128.)

The very scheme which the legislature devised and enacted into a general law in 1875 involved the appropriation and devotion of the lands, covered by the route designated by the commissioners, to the corporate use of the railroad company to be organized.  That would seem to be a necessary and legitimate construction, if we would give efficacy to the legislation, and sense and force to the provisions for the creation of the new corporation, and for its confinement to certain routes in the operation of its corporate franchises.

It seems to me that when the proceedings, instituted under the Rapid Transit Act of 1875, have terminated in the organization of a corporation, which must construct, maintain and operate a railroad upon certain routes prescribed and located by commissioners, as the public agents directed by the act to be appointed for that purpose, the lands necessary for the purpose have been as much appropriated and devoted to that exclusive use by sovereign power, as though it had been so declared in some especial enactment.   When the route or routes were located, upon which the railroad of the new corporation should be constructed, what other legal effect could follow except a subjection of the land affected to this species of public use, as through the exercise of paramount right ?

The subsequent purchase, or condemnation of the title to the lands, in the course of the railroad construction, was merely incidental, and was necessary in order to compensate property owners for the land taken, and to effect a transfer of the legal title.   The right which the plaintiff acquired to construct and operate the railroad upon the route described in its articles of association lacked nothing for its efficacy or completeness.   It had become an obligation, and was one of the unalterable conditions and a fixed public feature of the corporate existence. When to it were subsequently added the consents of municipal

authorities and of property owners, was any feature wanting to the fullest franchise in such respects? To say that the right to appropriate the land on the designated routes for railroad uses was not vested, but merely inchoate, in my judgment would be a great misapprehension of the effect and value of formal proceedings conducted under legislative authority and direction, and of the formal consents of the public authorities to the projected line. A striking feature of this public law, which authorizes the appropriation of the streets and lands within a county for railroad uses, when the necessity for such has been determined by public commissioners, is the imperative nature of the direction to construct, under the penalty of forfeiture, within the time fixed and upon the conditions set forth in its articles. How can a franchise so conferred by the legislature be deemed inchoate and defeasible? Is not its possession an element of the security upon which capital has been subscribed and loans have been made to the company? The construction of this railroad had been proceeded with upon the plans of the commissioners and with reference to the projection of the route upon the line designated and consented to. The company's funds had been expended with reference to its road being constructed upon the plans and routes designated by the public agents. In the case of the Broadway Surface Railroad (*People* v. *O'Brien*, 111 N. Y. 1), the corporate franchise, acquired under the authority of the legislature and the consents of the municipal authorities, to lay tracks and to run cars upon Broadway, was held by us to be a right indestructible by the legislature, and to constitute property in the highest sense of that term.

I think we must conclude that the statutory proceedings, which resulted in the organization of the plaintiff corporation, had the effect of vesting in it the absolute and exclusive franchise to build upon the route located for it, and to the use of which the lands were devoted, through the exercise of the paramount right of sovereign power; which franchise was unimpaired, with respect to the right to take and use the land in question, by the fact that the work of actual construction

had not reached it, at the time the legislature passed the act for the new parks.

The articles of association, under which this corporation was formed, were its charter with the state, and though a deprivation of the franchises granted may be within the power of the legislature to authorize, if some public necessity should demand it, we should not deem that power exerted, in the absence of some unequivocal expression of the legislative intent.

The New Parks Act of 1884 does not expressly exclude the plaintiff from the tract appropriated to St. Mary's park ; nor is there any reference to, or mention of the plaintiff in its provisions.    Can we justly say that a legislative intention to make so exclusive an appropriation for park purposes appears from the terms of the act ; shall we imply such an intention from its general grant of power ?    It is true that the legislature has said that the tracts designated for these parks "are all hereby declared to be respectively public places and public parks for public use and public purposes," but these are general terms, which describe the character and object of the legislative grant.    They do not necessarily conflict with the completion and maintenance of the plaintiff's railroad upon a route authorized and located within the tract now set apart for one of the parks.    The continuance of such a prior public use may have been deemed by the legislative body quite consistent with the new use of a public park.    It may indeed be conceded that the legislature had in view, in enacting the New Parks Act, a particular and existing public need ; but it is not necessarily to be inferred, or implied from language, which is applicable to a legislative provision for that purpose, that a prior public use, also intended for the public accommodation, is to be destroyed.    It is wiser to assume that the legislature intended that the two uses should stand together, as equally subserving the public interests.    The integrity of the prior appropriation for the purposes of the plaintiff's incorporation should not be assailed upon the basis of an implication from the general terms of an act, which we may believe to have been framed with actual knowledge of the plaintiff's condition and

upon the belief that the operation of the plaintiff's franchises, as directed in its articles, would be in the line of the general public interests. If it was necessary to the conclusion to establish knowledge upon the part of the legislature as to the plaintiff's incorporation and construction, that could be shown by the fact that there was made to that body a report by its commission; to which reference is made in the act and which contained information of the plaintiff's progress in the work of construction; but such knowledge is not essential. What we hold is that as the legislature, in enacting this chapter providing for the creation of new parks, did not expressly confer the power upon the defendants to take the lands for such a purpose, to the exclusion and deprivation of the plaintiff company, such a power does not flow from the general and descriptive terms, in which the legislature declared the object in view. There is not enough in the New Parks Act to warrant the presumption that its effect was meant to extend to the injury of the other important public use. The appropriation of the described tract to the purposes of a public park was subject to the exercise by the plaintiff of its franchise to maintain and operate its railroad upon the strip of land across the park. The power, which had been conferred upon it to proceed with and upon such a route, was never taken away, expressly, or by any reasonable intendment, and the subsequent appropriation of the tract to a public park use was necessarily made subject to the plaintiff's chartered rights.

The case of *The Matter of the City of Buffalo* (68 N. Y. 167) is much in point, upon the intent to be ascribed to the legislature. There the act in question (which was the city's charter) authorized the city to acquire the fee of any lands within its boundaries for canals and other public uses, and it endeavored to extend a canal through lands already appropriated for railroad purposes. It was held that if there had been a legislative appropriation of the lands to another important public use, it was not to be presumed that the unlimited power of the city to take any lands was meant to extend so as injuriously to affect the railroad use. It was said that " a legislative

intent that there should be such an effect will not be inferred
from a gift of power made in general terms.  To defeat the
attainment of an important public purpose, to which lands
have already been subjected, the legislative intent must une-
quivocally appear." 'And it was considered to be manifest
that the city's project would not be a tolerable interference
with the existing public use of the railroad, which might be
compensated for in damages, but an entire superseding of it
by another public use; which effect the court refused to pre-
sume the legislature intended.  The fact that in that case the
power to take was as to any and all lands within the city
boundaries, while, in the present case, the power is conferred
as to a particular tract, is not material.  In the absence of
express language, no implication of an intention to supersede
the prior devotion to the public use of the plaintiff's railroad
can be predicated upon the general terms of an act, which does
not require such by reason of some inherent necessity, or for
the attainment of an object not otherwise to be effected.  A
construction of an act should be avoided which would injuri-
ously affect the rights of others, and that sense should be
attached to its provisions which will harmonize its objects
with the preservation and enjoyment of all existing rights.
Considered in this way, the act of 1884, creating these public
parks, leaves intact and unaffected the public railroad uses, to
which the lands included within the park areas had been sub-
jected; whether, as in the present case, the railroad was not
yet actually constructed upon the land appropriated for the
purpose, or, as in several known instances, the railroad was in
actual operation.  Though, in a certain sense, a public park
use may be said to be inconsistent with a railroad use of prop-
erty, still that is not a view which we should logically take,
when considering the effect of the legislative appropriation to
park uses upon another important public use, previously
authorized by the legislature.  The public accommodation is
the object of the latter, as the public pleasure and recreation
are the objects of the former.  We may justly assume, from
the absence of explicit language, or from the knowledge pos-

sessed by the legislative body of the facts, that the park use
was believed to be subserved by the continued operation of
the railroad. However that may be, the subsequent appro-
priation of the lands to park purposes, for want of terms con-
veying a different intention, was subject to all rights acquired
by the plaintiff corporation and to the operation of its
franchises.

The complaint sufficiently set forth the grounds upon which
the plaintiff was entitled to relief, and the judgments and
orders at the Special and General Terms below should be
reversed; the demurrer interposed by the defendants to the
complaint should be overruled, and judgment should be entered
below against the defendants granting to the plaintiff the relief
prayed for.

All concur.

Judgment accordingly.