THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ADIRONDACK RAILWAY COMPANY, Appellant, Impleaded with the INDIAN RIVER COMPANY and Others.

*Adirondack Park — right acquired by a railroad by filing a map and profile in* 1897 *but before the purchase by the State of land described in chapter* 395 *of* 1895.

Where a railroad, which has received from the State a franchise to build and operate its road through certain counties, including a region which it is subsequently provided by chapter 395 of the Laws of 1895 may be acquired for the purposes of the Adirondack Park, files a map and profile of its proposed route in 1897, and gives the requisite notice to the owners of the land through which

it passes, including a portion of the region covered by the act of 1895, it thereby acquires such a right in its proposed route that the State of New York, in subsequently purchasing the region in which it exists, takes title subject to the right of the railroad company, by condemnation proceedings, to perfect its title thereto.

The right to such strip of land acquired by the railroad company by the previous filing of the map and profile is not affected by condemnation proceedings taken by the State against the owner of the region in which it is embraced, where notice of such proceedings is not given to the railroad company.

HERRICK, J., dissented.

APPEAL by the defendant, the Adirondack Railway Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Albany on the 7th day of November, 1898, upon the decision of the court rendered after a trial at the Albany Special Term.

The action is one to enjoin the defendant from taking, by condemnation proceedings, any part of the lands described in the complaint, for the purpose of its railway, on the ground that it is within the bounds of the "Forest Preserve" and of the "Adirondack Park."

Upon the trial at Special Term a judgment was rendered in favor of the plaintiff for the injunction so asked, and from such judgment this appeal is taken.

*R. Burnham Moffat* and *Lewis E. Carr*, for the appellant.

*G. D. B. Hasbrouck, Deputy Attorney-General,* and *Edward Winslow Paige,* for the respondent.

PARKER, P. J.:

The defendant had acquired from the State a franchise to build and operate its road through the counties and region which the State subsequently, by the act of 1895 (Chap. 395, amending Laws of 1892, chap. 488, § 290), provided might be acquired for the purposes of the "Adirondack Park."

Under the franchise so acquired, the defendant was proceeding to extend its road through such counties, and to that end, on the 18th day of September, 1897, filed in the several counties in question a map and profile of its proposed route, and at once gave the requisite notice to the owners of the lands through which it passed. Such proposed route has never been changed.

At that time the State had not acquired any interest in the strip

of land so located. There is no claim that it had either acquired a conveyance of, or taken any proceedings to condemn, such strip prior to that date.

It is said in *Rochester, Hornellsville & L. R. R. Co.* v. *N. Y., L. E. & W. R. R. Co.* (44 Hun, 206–210) that when a railroad company has filed the map and given the notice required by the statute, it has thereby "acquired a vested and exclusive right to build, construct and operate a railroad on the line which it has adopted." And again (on p. 211), it is said that such railroad company "has a franchise conferred upon it by the legislature to construct its road over the established line."

This case decided that the owner to whom such notice was given, and who had failed to obtain a change of the line, in the method provided by the statute, could not convey the land over which such line passed to a purchaser or lessee, unaffected by the company's right to complete its title by condemnation, and thereafter to construct its road thereon. This decision was unanimously affirmed by the Court of Appeals (110 N. Y. 128), and in that case (on p. 133) the following language is used: " This right to locate its line of road, at its election, is delegated to the corporation by the sovereign power, as is the right, subsequently, to acquire, *in invitum*, the right of way from the landowner, and any land needed for the operation of its road. * * * When, therefore, a corporation has made and filed a map and survey of the line of route it intends to adopt for the construction of its road, and has given the required notice to all persons affected by such construction, and no change of route is made, as the result of any proceeding instituted by any landowner or occupant, in our judgment, it has acquired the right to construct and operate a railroad upon such line, exclusive in that respect as to all other railroad corporations and free from the interference of any party. By its proceedings it has impressed upon the lands a lien in favor of its right to construct, which ripens into title through purchase or condemnation proceedings." (See, also, *Suburban Rapid Transit Co.* v. *Mayor, etc., of N. Y.,* 128 N. Y. 510; *Pocantico Water Works* v. *Bird,* 130 id. 249, 256.)

Upon the authority of these cases it is clear that, as a purchaser, the State took, under the conveyance to it of the strip of land in question, no title except such as was subject to the right of the

defendant to perfect, by condemnation proceedings, its title thereto. At the time the defendant filed its map and gave the notice above stated, the strip described therein was no part of the Adirondack Park nor of the forest preserve. Until purchased or condemned, it was no part of such premises, and it would never become a part thereof unless in the judgment of the proper commission it was deemed necessary for such purpose. When the commission, after concluding that it was necessary, attempted to procure the same, this strip had become impressed with the rights of the defendant, as above specified, and any conveyance which the owner could give was subjected to that right. So far as the State claims under its deed it stands simply as a purchaser. It acquires the rights which its grantor had — no more, and, as purchaser, it can claim no more. By making the purchase and taking that conveyance the State was not exercising the right of eminent domain; it was simply acquiring by contract the title which the Indian River Company then had. No other rights than theirs were transferred, and no others were affected by such conveyance. It was upon this theory that a majority of the court concurred in the case of *Adirondack Railway Co.* v. *Indian River Co.* (27 App. Div. 326, 335).

Nor did the State acquire any greater interests in the lands by the condemnation proceedings which it claims to have instituted under the provisions of sections 3 and 4 of chapter 220 of the Laws of 1897.

Such proceedings were taken against the Indian River Company only, and the notice required to be given by the 4th section of that act was given to that company only. No notice whatever was given to this defendant. No description of its rights in, or claim to, the strip in question was mentioned or referred to in the certificate filed. No actual possession has ever been taken of this strip. Not a thing in the record indicates an intent to acquire or cut off the rights of the defendant in such strip; and the defendant has never been in a position where, under the provisions of sections 5 and 6 of that act, it could ask damages against the State for any rights of which it has been deprived. The proceeding seems to have been to acquire only the rights which the Indian River Company had in the premises, and by such a proceeding the State has acquired no more than it did by its grant from the same company.

Clearly, under the decisions above cited, the defendant had

acquired property rights in that strip of land, which neither a conveyance from the owner, nor condemnation proceedings against such owner alone, could operate to cut off.

The question is not now presented to us, whether the State may, under the exercise of its right of eminent domain, take from this defendant the rights which it has acquired in the strip of land in question, but whether it has as yet actually done so. In our judgment it has not.

When the strip of land in question was located by the appellant, it passed through lands which were no part of the forest preserve. Hence no provision of the Constitution, nor of any law, was applicable to prevent it, and when it was taken into that preserve, it was taken by the State subject to the rights which the appellant had then already impressed upon it.

We, therefore, conclude that no reason has been shown why the defendant is not entitled to proceed with the condemnation proceedings it has inaugurated. The judgment restraining it from so doing was erroneous and should be reversed.

All concurred, except HERRICK, J., dissenting in opinion, and PUTNAM, J., not sitting.

HERRICK, J. (dissenting):

I cannot agree to the conclusion arrived at by the court in this case, nor in the reasons thereof contained in the opinion of the presiding justice, and the principles involved are so important that I feel constrained to express my views at some length.

In order to a complete understanding of the case, it seems to me that a somewhat fuller statement of facts is desirable than that contained in the prevailing opinion.

Section 7 of article 7 of the Constitution provides as follows: "The lands of the State, now owned or hereafter acquired, constituting the forest preserve, as now fixed by law, shall be forever kept as wild forest lands. They shall not be leased, sold or exchanged, or be taken by any corporation, public or private, nor shall the timber thereon be sold, removed or destroyed."

What constitutes the forest preserve is defined by section 270 of chapter 488 of the Laws of 1892, as amended by chapter 395 of the Laws of 1895.

Section 290 of the act of 1892, as amended by said chapter 395, describes what lands shall constitute Adirondack Park, and provides that "such park shall be forever reserved, maintained and cared for as ground open for the free use of the people for their health and pleasure, and as forest lands necessary to the preservation of the headwaters of the chief rivers of the State and a future timber supply, and shall remain part of the forest preserve."

The lands described in the description of what constitutes Adirondack Park embraces lands within the towns and counties theretofore included in the description of the forest preserve.

By chapter 220 of the Laws of 1897 there was constituted "The Forest Preserve Board," whose duty it was made, and it was thereby authorized, to acquire for the State, by purchase or otherwise, such lands embraced within Adirondack Park as it might deem advisable for the interests of the State; and if it could not agree with the owners upon the value of the property it was authorized to acquire it by proceedings therein prescribed. After the board had entered upon the discharge of its duties, a corporation, known as the Indian River Company, together with a Mr. McEchron and others, offered to sell to such Forest Preserve Board the whole of township No. 15 and 18,000 acres in township No. 32 of the Totten and Crossfield Patent, which offer was accepted by the Forest Preserve Board on the 6th day of August, 1897.

The lands so agreed to be sold and purchased were within the boundaries and part of the forest preserve and Adirondack Park. It appears that the parties offering to sell to the State did not own all the lands that they had agreed to convey, and while they were procuring title to the necessary lands in order to convey them to the State, and before the delivery of a deed thereof to the State, and on the 18th day of September, 1897, the defendant, which is a railroad company, with a road maintained and operated from Saratoga Springs to the village of North Creek, in the county of Warren, and which desired to extend its road from North Creek to Long Lake, caused a map and profiles of its road from North Creek to Long Lake to be made, which map and profiles were duly certified to by the president and engineer and filed in the offices of the county clerks of the counties of Warren, Essex and Hamilton. A portion of the route described in such map and profiles passed over

the tract of land known as township 15, and over the land agreed to be sold to and purchased by the Forest Preserve Board, as above set forth.

The defendant thereafter, by complaint verified on the 29th day of September, 1897, commenced an action against the Indian River Company, McEchron and the other persons who had agreed to sell such lands to the Forest Preserve Board, asking that they be restrained and enjoined from selling such portion of the lands aforesaid as was comprised within the route adopted by the defendant over said township No. 15, as shown on the map filed by them, " except said conveyance be expressly made and received subject to the right of way thereover of the plaintiff's (defendant's) said road.'"

An injunction was granted restraining said persons from conveying such lands to the Forest Preserve Board.

The order granting such injunction was appealed from to this court, and on or about the 2d day of March, 1898, this court reversed the order granting the injunction, and directed that it be dissolved.

In the meantime, and on the 6th day of October, 1897, the Indian River Company deeded to the State the lands theretofore agreed to be sold to it, through the Forest Preserve Board, excepting that portion of those lands described in the map and survey filed by the defendant. On the same day a deed of the lands described in said survey was drawn up and placed in escrow to be delivered when the injunction should be dissolved.

Upon the 7th day of October, 1897, the Forest Preserve Board caused to be filed in the office of the Secretary of State a description of the lands described in the map and profiles filed by the defendants as provided for by section 4 of chapter 220 of the Laws of 1897, and notice thereof was served upon the Indian River Company as the owner of such lands.

The statute provides that " From the time of such service the entry upon and appropriation by the State of the real property described in such notice for the uses and purposes above specified, shall be deemed complete, and thereupon such property shall be deemed and be the property of the State. Such notice shall be conclusive evidence of an entry and appropriation by the State."

The statute further provides that " Claims for the value of the property taken and for damages caused by any such appropriation

may be adjusted by the Forest Preserve Board if the amount thereof can be agreed upon with the owners of the land appropriated. * * * Upon making such agreement the board shall deliver to the owner a certificate stating the amount due to him on account of such appropriation of his lands, and a duplicate of such certificate shall also be delivered to the Comptroller. The amount so fixed shall be paid by the Treasurer upon the warrant of the Comptroller." (§ 5.)

" § 6. If the Forest Preserve Board is unable to agree with the owner for the value of the property so taken or appropriated, or on the amount of damages resulting therefrom, such owner, within two years after the service upon him of the notice of appropriation as above specified, may present to the Court of Claims a claim for the value of such land and for such damages, and the Court of Claims shall have jurisdiction to hear and determine such claim and render judgment thereon. Upon filing in the office of the Comptroller a certified copy of the final judgment of the Court of Claims * * * the Comptroller shall issue his warrant for the payment of the amount due the claimant * * * and such amount shall be paid by the Treasurer."

On the 11th day of November, 1897, the Forest Preserve Board paid to the Indian River Company the full amount of the purchase money under their contract for said lands, and upon the dissolution of the injunction the deed held in escrow of the lands described by said map and profiles was delivered to the People of the State of New York, and thereafter recorded.

In the meantime, before the payment of said purchase money, and on the 7th day of October, 1897, the same day the Forest Preserve Board filed its description of lands to be taken, but whether before or after such action is disputed, and it seems to me unnecessary to determine, the defendant began proceedings against the Indian River Company and others, to condemn the lands described in such map and profile, by serving upon one or more of the owners of said lands a petition for the condemnation of said lands, together with a notice of the time and place of its presentation to the court, the People of the State and the Forest Preserve Board not being made parties to such proceedings. Before such condemnation pro-

·ceedings were terminated, the action now under consideration was commenced for an injunction restraining the defendants from pro-·ceeding further.

It will thus be seen that before the defendant had filed its map ·and survey, the State had designated the territory through which ·such route ran as a portion of the Adirondack Park and forest preserve, and that the State through the Forest Preserve Board had entered into a contract for the purchase of the specific lands in question; and that before proceedings had been commenced by application to the court by the defendant to condemn such land, the State had acquired the title thereto by deeds from the owner thereof, and ·also by appropriating the same in the manner provided by statute, and that it thus became a part of Adirondack Park and the forest preserve, which the Constitution provides shall be inalienable. `

It is contended, however, upon the part of the defendant, and that contention is sustained by Mr. Justice PARKER in his opinion, that the defendant, by filing its map and survey, acquired a property or vested right which did not pass by the conveyance to the State or by its appropriation, and that whatever rights the State has acquired are subject to those of the defendant, and subject to its right to ·acquire title to the land covered by such route and survey by con-·demnation proceedings.

While the State has the right to alter, modify, limit or entirely withdraw the franchise given to the defendant to operate a railroad, I will concede that where under such franchise it has acquired any property or vested right, such property or vested right cannot be taken away from it, except by awarding compensation.

The mere privilege of acquiring property by the right of eminent domain granted to it by the State is not an absolute right, but one that it holds subordinate to the State, and such power it cannot share with the State, nor exercise upon an equality with it.

When the State elects to exercise the right of eminent domain in its own behalf, it is supreme; all other rights or privileges of a like ·character theretofore granted by it must give way to it.    It is a right it cannot part with or bind itself not to exercise; and when it attempts its exercise no such question can arise between it and any corporation to whom it has granted the privilege of exercising a like power, as has frequently arisen between corporations, municipal or

otherwise, as to who has the prior right. The only limitation upon its exercise, that I can conceive of, is that when the corporation to whom has been granted the exercise of such right has acquired property pursuant to it, such property cannot be taken away without just compensation; and in that respect it occupies the same position as the individual owner of property — each is under the equal protection of law. But before such corporation has exercised the power conferred upon it and acquired property pursuant to it, it has no rights or privileges which it can set up as against the State; such power and privileges granted to it are held subordinate to and subject to the right of the State to exercise this high prerogative at any time in its own behalf. This power is one of the attributes of sovereignty which the Legislature cannot grant away, or place the State upon an equality of exercise with, or in subordination to, any other corporation or being; it is a power of which it must at all times retain the free and unrestricted use.

This subject was heretofore discussed by me in the case of *The Adirondack Railroad Co.* v. *Indian River Railroad Co.* (27 App. Div. 326), and I will not repeat or enlarge upon that discussion here.

It is contended, however, that, before the State had acquired any title or interest in these lands, the rights of the defendant had become absolute and fixed by filing its map and plans, and the cases of *Rochester, Hornellsville & L. R. R. Co.* v. *N. Y., L. E. & W. R. R. Co.* (110 N. Y. 128); *Suburban Rapid Transit Co.* v. *Mayor* (128 id. 510), and *Pocantico Water Works Co.* v. *Bird* (130 id. 249, 256) are relied upon to sustain that contention.

It will be observed that none of those cases were cases where the State was a party; none of them were cases where the landowner was a party; they were all cases between contending corporations upon whom had been conferred the power of eminent domain, and the real question decided was, that the corporation first filing its map and survey acquired as against the others an exclusive right to the use of such land for corporation purposes; that was all that was decided in any of those cases, and in none of them was it necessary to decide, nor was it decided, that by so filing the map and survey the corporation acquired any interest in, or title to, the land described therein.

The judges writing the opinions in those cases, as frequently occurs, used language and expressed opinions not necessary for a decision of the questions involved, which lead to some embarrassment; for instance, in the case of *Rochester, Hornellsville & L. R. R. Co.* v. *N. Y., L. E. & W. R. R. Co.* (44 Hun, 206-210) the judge said that by filing its map and plans, and giving notice, the corporation "acquired a vested and exclusive right to build, construct and operate a railroad on the line which it has adopted." And again, in the same case upon appeal, in the Court of Appeals (110 N. Y. on p. 133), the judge writing the opinion said : "This right to locate its line of road, at its election, is delegated to the corporation by the sovereign power ; as is the right subsequently to acquire, *in invitum,* the right of way from the landowner, and any land needed for the operation of its road.   *   *   *   When, therefore, a corporation has made and filed a map and survey of the line of route it intends to adopt for the construction of its road, and has given the required notice to all persons affected by such construction, and no change of route is made, as the result of any proceeding instituted by any landowner or occupant, in our judgment it has acquired the right to construct and operate a railroad upon such line ; exclusive in that respect as to all other railroad corporations and free from the interference of any party.   By its proceedings it has impressed upon the lands a lien in favor of its right to construct, which ripens into title through purchase or condemnation proceedings."

Of course if the language used in the several opinions in the cases referred to is to be taken literally, all discussion of this question is ended, and it must be considered as established law that the Legislature has power to confer upon a corporation the right to take from a man without notice, and without compensation, the most valuable element of his property, his right to freely dispose of it.   That a corporation can, of its own motion, without application to the courts, absolutely forbid the sale or disposition of a man's property.   Can for an indefinite period of time tie it up in his hands, and compel him to hold it until such corporation gets ready to take possession of it upon the payment of such an amount as it chooses to offer, or third parties (commissioners) say shall be paid for it, or to transfer it subject to the same burden.   Can place an incumbrance upon it that depreciates it in value, that prevents its free sale.   That when

he has agreed upon its sale, and the sale of the whole of it, and ·all interest in it, can by its own absolute fiat, by merely filing a statement of what it wants, absolutely prohibit its sale.

All this is so contrary to fundamental principles, repeatedly recognized by the Court of Appeals, that I refuse to believe that it intended to so decide.

As a general rule the court only passes upon what is necessary in ·order to decide the case before it.

It will be observed that the language of the opinions, in the cases referred to, goes much further than was necessary for the decisions ·of those cases.

Take the case of *Rochester, Hornellsville & L. R. R. Co.* v. *N. Y., L. E. & W. R. R. Co.* (*supra*) as an illustration. The only parties before the court were the two railroad corporations; the only question necessary to be decided was, which had precedence. It was not necessary to determine that no one else could interfere with the rights or proceedings of the corporation which had filed its map and survey, nor was it necessary to determine that it had an absolute right to construct and operate a railroad upon the line described in such map and survey, nor that it had acquired a lien as against any other person or corporation than the competing corporation, which had subsequently filed its map and survey.

'Neither the State nor the owners of property were before the court in any of those cases. Neither had an opportunity to be heard. The rights of neither were considered. And the opinions were written evidently without considering how their language might affect the rights of the State or property owners.

In determining the force and effect to be given to the language ·of an opinion, we should bear in mind what was said by the court in the case of *Colonial City T. Co.* v. *K. R. R. Co.* (154 N. Y. 493, 495): " If, as sometimes happens, broader statements were made by way of argument or otherwise than were essential to the decision of the questions presented, they are the dicta of the writer of the ·opinion, and not the decision of the court. A judicial opinion, like ·evidence, is only binding so far as it is relevant, and when it wanders from the point at issue it no longer has force as an official utterance."

The question before the court in those cases was not the general question as to what rights had been acquired by the corporations

filing maps and surveys of the lands they desired to appropriate, but simply what rights they had acquired as against other corporations, to whom had been granted similar powers.

The questions to be decided in this case, however, are questions arising between the defendant and the State, and between the defendant and the owners of the lands described in the defendant's map and profile, not questions between the defendant and any other corporation. We are called upon to determine whether the defendant had acquired any such interest in such lands as against the owners as would prevent their conveying them free and clear of all liens or incumbrances.

It becomes necessary then to discuss whether, by filing its map and survey, the defendant acquired any vested or property right in or to the lands in question.

If it obtained any interest in or to the lands in question, it must have been from or in derogation of the rights or interest of the former owner.

It had not acquired title to the land or a right to the possession thereof; these could only be acquired after it had taken proceedings to condemn the land, and had paid the owner for it. (Code Civ. Proc. §§ 3371, 3373.) As between the landowner and the corporation, no rights had become fixed or vested.

The rights of the respective parties, that is, the landowner and the railroad company, do not become fixed until they have progressed so far as to give mutual rights, that is, until the confirmation of the report, when the landowner becomes entitled to the compensation or damage fixed by the commissioners in their report, and the railroad company becomes entitled to the land upon the payment of such compensation or damages. (*Matter of Rhinebeck & Conn. R. R. Co.*, 67 N. Y. 242; *Corporation of City of New York v. Mapes*, 6 Johns. Ch. 46; *Corporation of City of New York v. Dover Street*, 18 Johns. 506.) Until that time no rights are vested in either party.

In the cases of *Corporation of City of New York v. Dover Street* (18 Johns. 506) and *Corporation of City of New York v. Mapes* (6 Johns. Ch. 46) it was held that no rights became vested before the appointment of commissioners to appraise the damages, but those cases left it open to be inferred that the rights of the parties became

vested upon the appointment of such commissioners.    Subsequently, in the case of *The People* v. *Corporation of Brooklyn* (1 Wend. 318), the court, upon reviewing those and other cases, held that the rights of the parties did not become fixed and vested until the confirmation of the report of such commissioners; that up to the time the report was made the parties seeking to condemn could not know the amount that they would have to pay for the land, and, therefore, could not tell whether they would wish to proceed; and that up to that time the court had the right to permit them to discontinue, but after the report had been confirmed, then for the first time the rights of the parties became fixed and vested.    (See, also, to the same effect, *The Matter of Canal Street,* 11 Wend. 154, and *Matter of Anthony Street,* 20 id. 618, 620.)

In *Matter of Commissioners of Washington Park* (56 N. Y. 144), where the park commissioners had caused a map of the lands to be taken to be filed, had passed resolutions that it was necessary to take such lands, commissioners of appraisal had been appointed, hearings had been had, the commissioners had made and were ready to file the report when the park commissioners obtained an order staying the filing of the report and staying the owners from taking any proceedings.

Subsequently leave to discontinue was granted upon payment by the park commissioners to the landowners, the parties to the proceedings, of their necessary and reasonable costs and expenses incurred upon the appraisement of damages.    This order permitting them to discontinue was sustained by the Court of Appeals upon the ground that neither party had acquired any vested rights; that until the report of the appraisers was confirmed, the board of commissioners of Washington Park had not acquired any title to the property and no rights for compensation had become vested in the property owners.

This case was approved in *Matter of Military Parade Ground* (60 N. Y. 319), where it was held that no title to lands was acquired simply by making and filing a map, plan or survey, under an act which conferred upon the department of public works the right to lay out and establish a parade ground, and which provided that the department of public works should cause a map to be made showing the locality and extent of the same, and certified by them,

which was to be filed as directed; and that from and after the filing of such map, the ground so described should become one of the public squares or places and public streets and avenues in the city; and which provided in another part for the appointment of appraisers to assess the damages; and it was held that, until the confirmation of the report of the commissioners of estimate and assessment appointed to make such assessments, the title to the lands did not pass to the city, but remained in the owners with full power to exercise entire control over it, subject only to the right of the city to acquire title according to law. And that, independent of the statute which authorized the park commissioners to discontinue proceedings, under the authority of the case of *Commissioners of Washington Park* (*supra*), the court had power to permit them to discontinue at any time before the confirmation of the report of the commissioners of estimate and assessment.

If the defendant then had neither the title nor the right to the possession of the land, what interest did it have in it? If it had acquired by merely filing the map and survey some interest in it, which the owner could not thereafter convey away, then it acquired that interest without notice and without compensating or providing for compensating the owner.

If it was a property right in the land, then the owner could not be arbitrarily deprived of it without adequate compensation.

The mere filing of the map and profile or survey, which is done without notice to any one, did not constitute a lien or incumbrance upon the land as against the owner; to hold that it did would be in contravention of that principle which forbids that a man shall be deprived of any of his rights without an opportunity to be heard.

It would be taking private property without compensation. One of the most valuable attributes of property is the right to freely sell it. Any lien upon it is a restraint upon its sale, a cloud and incumbrance upon it, which necessarily interferes with its sale; it is a depreciation of some of its value.

"Salability is an essential element of property, and the destruction or diminution thereof is a taking of property that cannot be done except through the exercise of the right of eminent domain or of the police power." (*Ingersoll* v. *Nassau Electric R. R. Co.*, 157 N. Y. 453–463.)

" The third absolute right inherent in every Englishman is that of property, which consists in the free use, enjoyment and *disposal* of all his acquisitions without any control or diminution, save only by the laws of the land." (1 Black. Comm. 138.)

" Whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment that materially affect its value, without legal process or compensation, it deprives him of his property within the meaning of the Constitution. All that is beneficial in property arises from its use and the fruits of that use, and whatever deprives a person of them deprives him of all that is desirable or valuable in the title and possession. It is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that it must in terms or in effect authorize an actual physical taking of the property or the thing itself, so long as it affects its free use and enjoyment or the power of disposition at the will of the owner." (*Forster* v. *Scott,* 136 N. Y. 577–584.)

In the case last cited the court held that portion of the statute which declared that no compensation should be allowed to the owner of land taken for a street, for any building erected thereon after the filing of a map of the proposed street, to be unconstitutional as taking property without compensation. To the same effect is the case of *German-Am. Real Estate Co.* v. *Meyers* (32 App. Div. 41).

To hold that the defendant by merely filing its map and profiles procured a lien and placed an incumbrance upon the land, would be to hold that an owner can be deprived of the free use and enjoyment of his property, and of his right to freely sell and alienate it without due process of law, without notice or an opportunity to be heard.

An opportunity to the citizen to test before the proper branch of our government the legality of the taking of his property is, and must ever remain, a necessary part of that " due process of law " guaranteed him by the Constitution. As was said by JACKSON, Ch. J., in *Scott* v. *City of Toledo* (36 Fed. Rep. 385, 397 [1888]): " The owner must in some form, in some tribunal or before some official authorized to correct errors or mistakes, have an opportunity afforded him to be heard in respect to the proceeding under which his prop-

erty is to be taken or burdened  *  *  *  in order to constitute such procedure ' due process of law.' "

And the same principle is recognized and stated in *People* v. *Supervisors* (70 N. Y. 228, 234 [1877]); *Stuart* v. *Palmer* (74 id. 183 [1878]); *People* v. *Turner* (117 id. 227, 236 [1889]); *Spencer* v. *Merchant* (125 U. S. 345, 356 [1887]); *Davidson* v. *New Orleans* (96 id. 97, 104 [1877]); *Kentucky Railroad Tax Cases* (115 id. 321, 331 [1885]).

Under the statute in this case the owner may or may not have an opportunity to be heard. The statute does not require notice to be given to the owner of the property. It requires notice to be given only to the occupant. (Laws of 1890, chap. 565, § 6 [The Railroad Law].)

If within fifteen days after the filing of the map the owner acquires knowledge of its filing, he may apply to a justice of the Supreme Court to have the route altered, that is, to have this lien upon his land removed. It will thus be observed that he has no opportunity to be heard upon the question as to whether a lien shall be placed upon his land, but an opportunity only to take steps to have it removed.

All the rights that the defendant has are under the statute and section referred to, and it is not sufficient that in a particular case the owner, as a matter of fact, has notice served upon him; the statute does not require such notice, and if it is a valid statute this lien can be acquired without serving any notice upon the owner at all, and without the owner ever having received any notice or knowledge of the proceeding until after, under the statute, it is too late for him to take any proceeding to remove the lien by changing the route.

And it is familiar law that a statute is to be tested not by what has been done under it, but by what may, by its authority, be done.

A lien upon real estate under which an owner may ultimately be deprived of his property therein, cannot be obtained without notice to such owner.

In the case of *Stuart* v. *Palmer* (74 N. Y. 183), which was the case of an assessment for a public improvement, and which assessment when made was declared by the statute to be a lien upon the land so assessed, and where the statute made no provision for notice

to be given, the court said, " It is not enough that the owners may by chance have notice, or that they may, as a matter of favor, have a hearing.   The law must require notice to them, and give them the right to a hearing and an opportunity to be heard.   It matters not, upon the question of the constitutionality of such a law, that the assessment has, in fact, been fairly apportioned.   The constitutional validity of law is to be tested, not by what has been done under it, but by what may, by its authority be done.   The Legislature may prescribe the kind of notice and the mode in which it shall be given, but it cannot dispense with all notice."

This case has been repeatedly approved of by the Court of Appeals, and is now perhaps the leading authority in this State upon the principle involved.

The statute in this case not having required notice of the filing of the map and profile to be given to the owner of the land, no lien or incumbrance could be validly imposed upon it by authority of its provisions; and it follows, therefore, that the defendant did not, by filing its map and profile, obtain any property right or interest in the land as against the owner, which would prevent such owner from conveying it free and clear to the State.

It is claimed, however, that by virtue of its franchise, the defendant has obtained a vested right to build a road over the route in question which cannot be taken away from it.

The error in that assumption arises, it seems to me, from a failure to appreciate what its franchise means, and what is granted by it.

Its franchise, as such, is simply the privilege to exist as a corporation ; a privilege granted to individuals to act together as one, with the right of succession ; together with the powers granted to enable such body to carry into effect the purposes of the organization ; the property it acquires by virtue of such privilege is separate and distinct from the privilege or franchise itself.

In this State individuals cannot of common right combine together to build and operate a railroad ; to do so is a privilege granted by the State.

And by making and filing its articles of incorporation under the statute, the corporation so formed obtains no property or vested right, except a mere right to exercise corporate functions, the right to existence as a corporation.

It has thereby obtained no right, upon its own motion, to appropriate lands, or an interest in them. The courts have repeatedly held that, by the General Railroad Law, the Legislature has not delegated to railroad corporations the power of determining what lands are necessary to be appropriated to their use for the purposes of their incorporation, but that under the statute it is for the courts to determine, upon the application of a railroad company, the question of the necessity and extent of the appropriation. (See *Rensselaer & Saratoga R. R. Co.* v. *Davis*, 43 N. Y. 137; *Rensselaer & Saratoga R. R. Co.* v. *Davis*, 55 id. 145; *Matter of New York Central R. R. Co.*, 66 id. 407.)

They are simply given the power to acquire lands by purchase or, in the event of failing to agree with the landowners, to acquire them under the right of eminent domain by application to the courts.

While a railroad corporation is formed for the declared purpose of building a railroad through a specified portion of the State, no right is conferred upon it to do so; what is given to it is not the right to build its road through such portion of the State, but the capacity to acquire the right from those owning the land over which such route proceeds.

This was well stated by Chief Justice Ruger in the case of *The People* v. *O'Brien* (111 N. Y. 1, 30). In that case the corporation was a street railroad company organized under chapter 252 of the Laws of 1884, which provides for the incorporation of street surface railroads, and requires, amongst other things, that the articles of association shall state the names of the cities, towns and villages, and the counties, together with the names of and descriptions of the streets, avenues and highways through which it is proposed to construct the road; and the chief justice in his opinion states: "By such incorporation the company became an artificial being, endowed with capacity to acquire and hold such rights and property, both real and personal, as were necessary to enable it to transact the business for which it was created, and allowed to mortgage its franchises as security for loans made to it, but having no present authority to construct or operate a railroad upon the streets of any municipality. This right, under the Constitution, could be acquired only from the city authorities, and they could grant or refuse it at their pleasure."

So in the case of the defendant, by its articles of association, while they described the localities through which it proposed to build the road, it acquired no present authority or right to construct the road through such localities, but merely the power or capacity to acquire the right from the owner or owners of the soil; as in the case of the street railroad company, it had to acquire that right from the municipal authorities who owned the streets through which it proposed to construct its route, and until it acquired such right, it acquired no property in such route.

The Constitution equally protects the municipality in its streets and the landowner in his property. And in the event of the railroad corporation failing to obtain the consent of either to its use, application may be made to the courts to obtain the necessary rights, and when so obtained they become property.

The fact that, by being authorized to build a railroad between prescribed points in the State and to file a map of its proposed route, and by doing so, such road acquires no title to or property in the land described in such map, even as against the State which conferred the right to build its road over such course, is illustrated by the case of *New York Central & H. R. R. R. Co.* v. *Aldridge* (135 N. Y. 83).

· The Hudson River Railroad Company was incorporated under chapter 216 of the Laws of 1846 for the purpose of constructing a railroad along the east side of the Hudson river from New York to Albany. Subsequently, it was consolidated with the New York Central Railroad Company. By chapter 30 of the Laws of 1848, the Legislature amended the act of 1846, and by section 5 of such amendment it gave power to the directors of the railroad company to alter the location of their road and adopt a new one in its place, as a substitute for the old location; a map of the course as altered was to be filed in accordance with the provisions of that section.

In 1868 the company, under the amendment of 1848, modified its location and altered its line and filed a map thereof as provided by law; subsequently, it made additional alterations and modifications and made a map thereof. By virtue of these statutes and by the filing of its maps indicating the course upon which it intended to lay out and operate its road, it claimed to have obtained title to certain lands under the waters of the Hudson river. The court

held that, neither by the acts of the Legislature nor by filing its maps, did the railroad obtain any title to the land in question. " The land was to be acquired subsequently. As to lands belonging to individuals the company secured no title by selecting and adopting a course and filing a map; it still had to purchase such lands or else obtain them by the exercise of the right of eminent domain. There is no provision in the law which makes a different result where the lands belong to the State." (P. 88.)

In the case of *Archibald* v. *N. Y. C. & H. R. R. R. Co.* (157 N. Y. 574), where the same railroad company, under the same statute, had filed its map and proceeded to fill in a parcel of land under water and thus reclaimed the land in controversy, the court held that it had acquired no title to the land in that way, or by indicating the parcel upon the map, and that " the railroad company could not acquire title to land under water by taking possession of it and filling it up. The title still remained in the State, and the grant from the sovereign to the owner of the adjoining upland would carry the title to him."

It will be observed that that case is in many respects a much stronger one in favor of the railroad company than the one at bar. There, pursuant to its charter and the act of the Legislature, it had filed its map of its proposed route running over lands of the State under water; it had filled in such lands, had expended money and labor in creating, so to speak, the tract of land in question, and yet it was held that the State, as the owner of the title, could convey such lands to an individual and that such individual acquired a title thereby superior to that of the railroad, and could maintain an action against it to recover the possession thereof and eject the railroad company therefrom; and the only reason that the defendant was not actually ejected, but permitted to occupy it in common with the plaintiff, was that, during the pendency of the action, it had procured the title of the plaintiff's co-joint tenants in such land.

If, under such circumstances, the State can convey title to land upon which it has, at least, given the railroad company a license to enter and use, with the power to acquire title to it, how much stronger is the right of an individual property owner to convey his property, which has been described in the map, upon which no money has been expended, and as to which he has granted to the

railroad company no rights of any kind whatever? If the State in the one case can give title free and clear to its grantee, notwithstanding the laying out of the route and filing a map by its permission, and the expenditure of its money pursuant to such permission, why should not an individual owner exercise the same power and authority over his land? If no property right has been acquired in the one case, none has been acquired in the other. The utmost that has been acquired is the right to obtain property.

There is a plain distinction between the franchise to be a corporation and the property acquired under such franchise. One can be altered, taken away or destroyed; the latter cannot be without compensation.

The case of *The People* v. *O'Brien* (*supra*), which is the leading and strongest authority in this State upholding the sacredness and inviolability of corporate property rights, recognizes this distinction; while it held that it was not within the power of the Legislature to destroy the property rights of a corporation acquired under its franchise, it was not questioned that the Legislature could destroy the existence of the corporation itself. (*Schurz* v. *Cook*, 148 U. S. 410.)

The mere privilege to act as a corporation, the so-called franchise, lacks one of the essential elements of property; it cannot be sold or alienated, except by express provision of some statute; at common law it is not transferable, nor can it be sold upon execution. (Thomp. Corp. §§ 5352, 5353; Morawetz Priv. Corp. § 924.).

I repeat, that all that the defendant acquired by its articles of association or incorporation was the power or capacity to acquire the right from the people owning the land to construct its road over such land, and that such power or capacity was not property or a vested right, but merely the privilege to acquire property or vested rights, and that this capacity or power so conferred upon it is not in and of itself property; if it was, it could not be taken away without compensation, and the courts have uniformly held that such power can be taken away from it without compensation, although the property that it has acquired, pursuant to such power, cannot be.

In the case of *Pearsall* v. *Great N. R. R. Co.* (161 U. S. 646, 673) the court cited, with approval, Mr. Justice COOLEY's definition of

vested rights, that is, that "Rights are vested in contradistinction to being expectant or contingent. They are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. They are expectant when they depend upon the continued existence of the present condition of things until the happening of some future event. They are contingent when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting." (Cooley Prin. Const. Law, 332.)

Accordingly it was held in that case that a clause in a charter of a railroad corporation granting it certain powers to consolidate with, or become the owner of, other railroads, was not such a vested right that it could not be rendered inoperative by a subsequent statute passed before the company had availed itself of this power granted by a former statute.

This was approved in *Bank of Commerce* v. *Tennessee* (163 U. S. 416) and *Galveston Railway Co.* v. *Texas* (170 id. 226), and I can see no distinction between the principle of those cases, and of one in which a railroad has the privilege to extend its route by the purchase or condemnation of lands, as long as it has not exercised that privilege and acquired the land.

The filing of the map under the definition above given of a vested right could not create a vested right. As was said in *Forster* v. *Scott* (*supra*) the corporation "might or might not appropriate the land according to their pleasure, notwithstanding the filing of the map." Or the court might or might not hold it to be necessary for the defendant's purposes. (P. 582.)

In this case the land in question had not been acquired either by executed contracts or by condemnation proceedings; nothing had been acquired from the owners; nothing had been taken away from them that pertained to their title or ownership; the most that can be said is, that the defendant had taken the first steps in proceedings which might or might not, continued to the end, result in acquiring property. It was a right which could only come into existence on an event or condition which might not happen or be performed until some other event might prevent its vesting, and the defendant, as was said in *People* v. *O'Brien* (*supra*), had "no pres-

ent authority to construct or operate a railroad" (p. 30) over the land in question; before it could do so it had to condemn it and pay for it; and, therefore, under the definition above given, as to what constitutes a vested right, the defendant had only a contingent interest, not a vested right, and such an interest is not property and is not within the protection of the Constitution.

There are some cases holding that any act or proceeding which prevents the corporation from fulfilling the purpose for which it was formed is practically a destruction of that corporation and its franchise, and, therefore, a taking of a right or thing of value. This, however, is not such a case. The defendant is not prevented from exercising its powers under its franchises by having its entire route taken away from it, and thus being unable to do that which it was organized to do, because it appears that the corporation is already owning and operating a road, and this proposed route is merely an extension of one already in existence; and if it does not obtain the route in question, it will still be an existing and operating road as it has been for a number of years.

In that respect it is like the case of *Pearsall* v. *Great N. R. R. Co.* (*supra*) which corporation had the right to extend its route by consolidating with, leasing or purchasing other roads, which right, as we have seen, the court held not to be property or a vested right, and, therefore, it could be taken away from it prior to its becoming possessed of such other roads by consolidation, lease or purchase.

Nor does it appear that the route in question is necessary to connect with any other portion of the road already constructed, nor that it is a necessary route to make a through line; that is, it does not appear that some other route may not be adopted which will answer the same purpose; therefore, the interfering with it or preventing its taking such route is not a practical destruction of its corporate franchise.

I refrain from discussing the question raised as to the constitutionality of the provisions of the statute providing for the taking of lands by the Forest Preserve Board, for the reason that when the State entered into the contract to purchase, the defendant had no property right in the premises, neither had it when the purchase was completed or the appropriation made; so that as to it, no con-

stitutional question can arise as to taking property without notice or hearing, and that question, therefore, cannot be raised by it.

One whose rights are not affected by the constitutionality of a law cannot raise that question.

At the time the defendant instituted its proceedings to condemn the premises in question, it knew of the action of the State, and, therefore, could take nothing by such proceedings.

If I am right in my conclusion that the defendant acquired no interest in the land as against the landowner that would prevent his conveying it to the State free and clear of any lien or incumbrance, then such land became at once subject to the provisions of section 7, article 7 of the Constitution, and there is no occasion to consider the effect of its filing a description of the lands to be taken as provided for by section 4 of chapter 220 of the Laws of 1897. If it by any means, whether by purchase or condemnation, acquired the land in question for public purposes, they cannot, nor can any interest in them, be taken away from it.

The judgment should, therefore, be affirmed.

Judgment reversed and a new trial granted, with costs to abide the event.